**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| ROBERT JUTAHN McCLAIN, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| V. | ) | CASE NO. |
| | ) | |
| LEXINGTON-FAYETTE COUNTY | ) | |
| URBAN GOVERNMENT, | ) | |
| LEXINGTON POLICE OFFICERS | ) | JURY TRIAL DEMANDED |
| CORY B.VINLOVE, DONNELL | ) | |
| GORDON, LAWRENCE WEATHERS | ) | |
| in their individual capacities | ) | |
| and unknown officers and | ) | |
| supervisors of the Lexington Police | ) | |
| Department | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT

NOW COMES Plaintiff, ROBERT JUTAHN McCLAIN, by his attorneys LOEVY & LOEVY, and complaining of Defendants LEXINGTON-FAYETTE COUNTY URBAN GOVERNMENT, Lexington Police Officers CORY B. VINLOVE, DONNELL GORDON, LAWRENCE WEATHERS, and other unknown officers and supervisors from the Lexington Police Department, and states as follows:

### Introduction

1.     Plaintiff Robert "JuTahn" McClain is a student athlete at the University of Kentucky ("UK").

2.      Now in his Junior year, Mr. McClain majors in Community Development and upon graduation desires to work with underprivileged children, providing them with a safe place away from home.



3.      Mr. McClain strives to be a positive role model for others, most especially his younger siblings.

4.      A native of Fairfield, Ohio, Mr. McClain was a prolific standout football player during high school.  Mr. McClain rushed for 4,406 yards and 53 touchdowns while catching 48 passes for 680 yards and 7 touchdowns in three seasons as a high school football player.

5.      A four-star prospect and the 2019 Division 1 All-Ohio Offensive Player of the Year, Mr. McClain opted to play football at the University of Kentucky over other schools including Ohio State, Penn State, and Michigan.

6.      Mr. McClain chose to play at the University of Kentucky because he loved the school and program.

7.      Due to his tireless work effort, Mr. McClain played in all 11 games his freshman season.

8.     That streak came to an end when, in March of 2021 and the months that followed, members and guests of the Alpha Sigma Phi fraternity and Defendants from the Lexington Police Department falsely accused him of burglary in the first degree, assault, and of brandishing a weapon.

9.     The lead Detective, Cory Vinlove, a recent graduate from the University of Louisville, knew that probable cause did not exist to charge Mr. McClain with any crime.



10.     Yet, in his quest to further his own career and embarrass the University of Kentucky football program, Defendant Vinlove embarked on a journey to frame Mr. McClain and other black men for a crime they did not commit.

11.     Defendant Vinlove even sought to announce his manufactured false charges on the eve of SEC media day to maximize the exposure and attendant embarrassment to the University of Kentucky and its players accused of crimes they did not commit.

12.     Make no mistake, Defendants' pursuit of Mr. McClain and others was never about a search for the truth.

13.     Fortunately, Mr. McClain had an alibi – he was at his apartment under Covid restrictions - and the "evidence" against him was false, flimsy, and fabricated.

14.     Accordingly, on September 28, 2021, a Fayette County Grand Jury returned a no true bill, thwarting the Defendants' attempt at a wrongful conviction.

15.     Although the charges against him were ultimately dismissed, Mr. McClain suffered great prejudice resulting from Defendants' misconduct.

16.     Mr. McClain not only faced a 10-20 year sentence of imprisonment if tried and wrongfully convicted, he suffered immense injury to his reputation, his name, image and likeness, his mental health, his college experience and education, and his football career.

17.     Mr. McClain now brings this action, pursuant to 42 U.S.C. §1983, for violations of his constitutional rights, seeking some measure of redress for the wrongful and unjustified actions of the Defendants.

## Jurisdiction and Venue

18.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

19.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

20.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all the Defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

### The Parties

21.     Plaintiff Robert "JuTahn" McClain is a 20-year-old African American college athlete who has no criminal history.

22.     At all relevant times, Defendant Cory Vinlove was an officer with the Lexington Police Department.  These Defendant Officers are sued in their individual capacities, and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

23.     At all relevant times, Defendant Donnell Gordon was a Sergeant at the Lexington Police Department and Defendant Lawrence Weathers was the Chief of the Lexington Police Department. Defendants Gordon and Weathers are sued in their individual and official capacities, and each acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

24.     Defendants Vinlove, Gordon, and Weathers are collectively referred to as the "Defendant Officers."

25.     Defendant Lexington-Fayette County Urban Government is a political subdivision of the Commonwealth of Kentucky and is a first rule class. Defendant Lexington-Fayette County Urban Government ("Lexington") is responsible for the policies, practices, and customs of the Lexington Police Department.

26.     Defendant Lexington-Fayette County Urban Government is referred to as the "Defendant Lexington."

### Alpha Sigma Phi Hosts Party Despite Restriction

27.     On March 5, 2021, the University of Kentucky Office of Student

Conduct placed the Alpha Sigma Phi fraternity on "interim restriction." Pursuant to

that restriction, the fraternity was not to host any in-person events and/or events

with alcohol until the conduct process for that case concluded.

28.     Despite that restriction, less than 24 hours later, the Alpha Sigma Phi

fraternity hosted a party at a home on 201 Forest Drive in Lexington.

29.     The fraternity was known for regularly hosting parties at that location.



30.     The chapter's treasurer collected money through Venmo to purchase

alcohol for the party, the chapter's social chair lived at the residence, and a fraternity

member served as the bartender for the night.

31.     The fraternity announced the party through text messages, SnapChat, and a Group Me page for the fraternity.

### Mr. McClain's Teammates Are Invited to the Party

32.     On the night of Saturday, March 6, 2021, while Mr. McClain was in quarantine after an exposure to Covid, some of Mr. McClain's football teammates were hanging out at another teammates' apartment. While there, the teammates learned of the Alpha Sigma Phi party after seeing the party announcement and after being invited by a female friend.

33.     Mr. McClain had been to the same home a week or two prior for another one of the fraternity's "open invite" parties.

### Fraternity Members and Guests Hurl Racial Slurs at Mr. McClain's Teammates

34.     Between 1:00 and 2:00 a.m. on Sunday, March 7, 2021, teammates Reuben "RJ" Adams and Joel Williams and a friend arrived at the Alpha Sigma Phi party.

35.     Mr. Adams and Mr. Williams arrived at the party in separate vehicles at approximately the same time. They walked in the open front door together.

36.     Upon entering the residence, Mr. Adams quickly observed that most of the 30-50 people in attendance were heavily intoxicated.

37.     In fact, unbeknownst to Mr. McClain's teammates at the time, the Lexington Police Department had been called to the same residence over 13 hours earlier for a noise disturbance and "loud party."

38.     Mr. Adams and Mr. Williams were welcomed into the home by a male believed to be a member of the fraternity. He was cordial to both.

39.     As Mr. Adams and Williams, both of whom are African American, walked through the home, however, a Caucasian female loudly questioned, "who let the n****** in?"

40.     Other Caucasian fraternity members and guests at the party also began hurling disrespectful, racial slurs toward the young men. Specifically, Mr. Adams heard a Caucasian male call them "p**** ass n******."

41.     A male Caucasian member of the fraternity yelled at Mr. Adams and Mr. Williams to "get the f*** out."

42.     Not wanting to cause any trouble and worried for his and his teammate's safety, Mr. Adams walked towards the back door of the home. Mr. Williams followed.

43.     Mr. Adams made his way out the back door and walked toward his vehicle. He then heard a commotion and walked back towards the home, worried about Mr. Williams, who had not yet made it out.

**Members of the Fraternity Physically Assault Mr. Williams**

44.     As Mr. Adams attempted to leave, male chapter members began pushing Mr. Williams toward the back door. Mr. Williams told the aggressors that he was leaving, but the fraternity members continued their physical assault of Mr. Williams.

45.     Mr. Williams was "jumped" by members and/or guests of the fraternity before he could exit the back door.  Multiple male chapter members swung, with their

fists, at Mr. Williams. Mr. Williams tried to defend himself before being able to finally run out of the back door.

## Members of the Fraternity Assault Mr. Tisdale

46.    As Mr. Adams and Mr. Williams were attempting to leave the residence, another football teammate, DeVito Tisdale, arrived at the party.

47.    Mr. Tisdale knew the house was a "weekend party spot" as he had been to the home for parties on previous occasions.

48.    As soon as Mr. Tisdale walked up to the front door, he was ambushed, physically assaulted, and called a "n***** boy." Mr. Tisdale defended himself from the blows that were being inflicted upon him.

49.    Mr. Tisdale ultimately backed off the front porch, left the residence, and returned to his dorm.

50.    At no point did Mr. Tisdale return to the home.

51.    At no point did Mr. Tisdale have a gun in his possession or witness any other weapon while at the residence.

## Mr. McClain Receives a Text Informing Him
## that Mr. Williams Had Been Jumped

52.    While at his residence under Covid restrictions, Mr. McClain received a text message saying that his roommate and teammate, Mr. Williams, had been jumped by members of the fraternity.

53.    Concerned for his friend's safety, Mr. McClain got out of bed, got dressed, left his home, and drove towards the location of the party.

9

54.     Once he arrived in the area, however, Mr. McClain was unable to turn on Forest Park Avenue because the road was blocked by law enforcement vehicles.

55.     Accordingly, Mr. McClain drove back to his apartment, without ever getting out of his vehicle.

## Lexington Police Department Investigates

56.     A member of the fraternity called the police.

57.     Police officers from the Lexington Police Department arrived at the home, spoke with the fraternity members and football players who were present, and investigated the alleged assault and burglary.

58.     Because no probable cause existed to charge any of the University of Kentucky football players with a crime, no arrests were made.

59.     Quickly, false allegations surfaced of the football players brandishing weapons at the party. But, those allegations differed greatly. Some fraternity members and guests alleged they saw an individual with a pistol, others alleged they saw up to four individuals with pistols, and others alleged they saw players wielding knives.

60.     No weapons were found at the scene or on the person of any of the players who were questioned.

## Mr. McClain Is Falsely Named as Assailant in Altercation and as Brandishing a Firearm

61.     Despite never getting out of his vehicle or even making it to the location of the party, Mr. McClain learned from coaching staff that he was being accused as

having been present in the home, as having physically assaulted occupants in the home, and as pulling a weapon on one of the fraternity members.

62.     Mr. McClain repeatedly denied being present at the party, denied physically assaulting anyone, and denied possessing a firearm.

### The Defendant Officers Receive Physical Evidence that Mr. Adams Did Not Assault Anyone

63.     Like Mr. McClain and his teammates, Mr. Adams cooperated with the police investigation. Immediately after the false allegations serviced, he voluntarily took photos of hands and knuckles, illustrating that he had not assaulted anyone, and forwarded those to authorities.

64.     Like Mr. McClain, Mr. Adams denied being personally involved in a physical altercation.

### Defendant Vinlove Takes Over the Investigation and Falsifies Information In An Affidavit

65.     On or about March 8, 2021, Defendant Cory Vinlove took over the investigation.  Despite learning from the beginning of the investigation that it was the fraternity members and their guests who assaulted Mr. Williams and Mr. Tisdale, and not vice versa, and learning that Mr. McClain was not present at the party, Defendant Vinlove and the other officers refused to charge the individuals who committed the assault and used racial slurs.

66.     Instead, Defendant Vinlove, a white officer, set out to make a name for himself and conspired to frame Plaintiff and his teammates.

11

67.     To that end, less than three weeks later, Defendant Vinlove fabricated information in a sworn affidavit to a Fayette County District Court Judge to obtain the contents of Mr. Adams' cellphone.

68.     Specifically, Defendant Vinlove falsely swore that Mr. Adams admitted to being involved in a physical altercation with two male white occupants of the home resulting in bruising to his knuckles, despite Mr. Adams' statement and physical evidence to the contrary.

69.     Defendant Vinlove also seized Mr. McClain's cellphone.

**Defendant Vinlove Learns of Information Obtained by the University Clearing Mr. McClain of Any Wrongdoing**

70.     The University of Kentucky's Office of Student Conduct conducted an investigation and held a hearing regarding the false allegations against Mr. McClain.

71.     On April 28, 2021, the University cleared Mr. McClain of any wrongdoing in regard to the altercation at the fraternity party.

72.     During the hearing, Mr. McClain expressed the devastating impact that the fabricated allegations had had on him up to that point: he'd been really nervous about the false allegations, he'd been without his cellphone for over a week causing him to fall behind in his classes, and the athletics department had withheld his check, causing him financial difficulties.

73.     Defendant Vinlove and the other Defendant Officers had access to the information obtained during University of Kentucky's investigation clearing Mr. McClain of any wrongdoing.

12

74. But in their quest to frame Mr. McClain for a crime he did not commit, however, Defendants intentionally ignored that information.

### Defendant Vinlove Learns the Tainted Identification of Mr. McClain and his Teammates Does not Establish Probable Cause

75. Defendant Vinlove and the other Defendant Officers were also provided with information regarding the accusers' alleged identification process of Mr. McClain and his teammates.

76. Specifically, the accusers alleged that the fraternity members got together, "threw names out" as to individuals they believed may have been present, and then looked through the football team's roster to pick out individuals who they thought matched the name and description of those they saw the night of the party.

77. Defendant Vinlove also learned that the accusers had been drinking alcohol, the only lights on in the home were in the dining room, and the altercation occurred at approximately 2:00 a.m.

78. Defendants were aware that the narrative and identifications provided by the fraternity members were unreliable.

### Defendants' Wrongful Prosecution of Mr. McClain

80. Despite having clear evidence to the contrary and no probable cause, on August 17, 2021 - over 5 months since members and guests of the fraternity verbally and physically assaulted Mr. McClain's teammates and four months after the University cleared Mr. McClain of any wrongdoing - Defendant Vinlove swore out a Criminal Complaint for Mr. McClain.

81.     Therein, Defendant Vinlove initiated charges against Mr. McClain for Burglary in the 1st degree, a Class B felony.  No probable cause existed for the initiation of charges.

82.     In so doing, Defendant Vinlove intentionally included fabricated information with the express intent on misleading the judicial system into approving false charges against Mr. McClain.

83.     Defendant Vinlove knew Mr. McClain was not at the party and did not participate in the altercation but charged him with burglary anyway.

84.     Two days later, Defendant Donnell issued a press release including the fabricated allegations against Mr. McClain and five other teammates.

85.     That release was picked up by the Associated Press and published by media outlets nationwide, including ESPN, the New York Post, and ABC News.

86.     Defendants forever tarnished Mr. McClain's reputation by setting in motion a criminal prosecution lacking probable cause.

87.     On August 20, 2021, a Fayette District Court Judge arraigned Mr. McClain on the charges. Mr. McClain pled not guilty.

**Defendant Vinlove Presents False Testimony to the Grand Jury**

88.     Despite having no probable cause, on September 28, 2021, Defendant Vinlove knowingly presented the false allegations against Mr. McClain and his teammates to a Fayette County Grand Jury.

89.     Defendant Vinlove knew that the witness statements used to initiate the burglary charge against Mr. McClain were false and fabricated. He knew Mr.

14

McClain was not even present on the night in question. Even still, he used these statements to falsely initiate charges.

## Mr. McClain's Vindication

90.     Fortunately, the grand jurors were able to deduce that the "evidence" Defendant Vinlove presented was false and fabricated.

91.     Accordingly, the grand jury returned a no true bill and dismissed the charges against Mr. McClain and his teammates.

92.     Mr. McClain and his teammates were immediately reinstated as active members of the University of Kentucky football team.

93.     The Glover/McClain family praised God that the truth finally came out.



94.     But Defendants' actions had a devastating impact.

## JuTahn McClain's Damages

95.     JuTahn McClain is an upstanding citizen and student athlete.

96.     Before being maliciously prosecuted for a crime he did not commit, he had never been inside a courtroom.

97.     He was proud to be a University of Kentucky student and football player.

98.     Because of the Defendants' egregious misconduct, Mr. McClain was suspended from the UK football team for months. While on suspension, he was not only prohibited from practicing with the team, but he was also banned from eating meals with the team - causing a financial burden - and from conditioning and working out with the team.

99.     He was stripped of playing in the first four football games of the 2021 season, ending his streak of playing in every game since joining the team, forever altering his career football statistics.

100.    He lost the spot he had earned on the team and is still fighting to regain it.

101.    Because of the false allegations levied against him and the damaging national publicity that followed, Mr. McClain's name, image, and likeness was tarnished.

102.    He lost endorsements that were pending prior to the fabricated charges, resulting in financial injury, both present and future.

103.    Complete strangers sent disparaging messages to and made derogatory posts about Mr. McClain on social media.

104.    The emotional pain and suffering Mr. McClain endured as a result of the Defendants' constitutional violations has been substantial.

105.   Tragically, Mr. McClain's mental health suffered greatly as a result of the false allegations levied against him by the Defendants and the possible consequences he faced as a result.

106.   He was so anxious, nervous, and depressed that he lost 25 pounds in a 2-month period, affecting his playing time once he was permitted to rejoin the team.

107.   Mr. McClain's education was also affected by the Defendants' misconduct. Mr. McClain used his cellphone to remotely attend classes, submit classwork, and keep up with his schedule.

108.   Because Defendant Vinlove confiscated Mr. McClain's cellphone and kept it for an extended period of time, Mr. McClain fell behind in his classes.

109.   As a result of being charged with a crime in which he had no involvement, Mr. McClain has suffered tremendous damage, including but not limited to mental and physical suffering, loss of a normal life and college experience, and damage to his name, image, and likeness, all proximately caused by Defendants' misconduct.

## Count I – 42 U.S.C. § 1983
## Malicious Prosecution

110.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

111.   As described more fully above, Defendants while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

17

112.    In the manner described more fully above, Defendants made, influenced and/or participated in the decision to prosecute Plaintiff, for which prosecution there was no probable cause and which caused Plaintiff to suffer a deprivation of liberty. Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

113.    As described more fully above, the prosecution was resolved in Plaintiff's favor.

114.    The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Plaintiff's liberty in violation of his constitutional rights.

115.    As a result of this violation of his constitutional rights, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

116.    Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Plaintiff's constitutional rights.

117.    The misconduct described in this Count was undertaken pursuant to a routine practice of the Lexington Police Department and the Lexington-Fayette County Urban Government to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

118.    These widespread practices, so well-settled so as to constitute *de facto* policy in the Lexington Police Department and the Lexington-Fayette County Urban Government were able to exist and thrive because municipal policymakers with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

119.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II – 42 U.S.C. § 1983 – Fourth Amendment
### Fabrication of False Evidence

120.    Each paragraph of this Complaint is incorporated as if restated fully herein.

121.    In the manner described more fully above, the Defendant Officers, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed to witnesses, and fabricated testimony offered at grand jury and other pretrial proceedings. Defendants knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors and courts that considered this false evidence when determining whether probable cause existed.

122.    The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

123.    Defendants misconduct directly resulted in the unjust continued prosecution of Plaintiff, thereby denying him from his constitutional right to due

process as guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Plaintiff's continued prosecution, and the prosecution of Plaintiff could not and would not have been pursued.

124. As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count III – 42 U.S.C. § 1983
## Supervisory Liability

125. Each paragraph of this Complaint is incorporated as if restated fully herein.

126. The continued wrongful detention of Plaintiff was caused by the deliberate indifference and recklessness of supervisory defendants, when they failed to adequately train and supervise the individual Defendant Officers.

127. Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

128. Furthermore, these supervisory defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and

20

other defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

129.   These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

130.   The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

131.   The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

### Count IV - 42 U.S.C. § 1983
### Failure to Intervene

132.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

133.   In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

21

134.    As a result of Defendants failure to intervene to prevent the violation of Plaintiff's constitutional rights, he suffered pain and injuries, as well as emotional distress.

135.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's rights.

136.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Lexington Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count V - 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

137.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

138.    After the underlying incident, the Defendants reached an agreement amongst themselves to frame Plaintiff for the crimes, and to thereby deprive him of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

139.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

140.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

22

141.   As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's constitutional rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

142.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

143.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the Lexington Police Department and the Lexington-Fayette County Urban Government in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

### Count VI - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Lexington-Fayette County Urban Government

144.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

145.   The actions of Lexington Police Department officers in withholding material exculpatory information from Plaintiff and their counsel were undertaken pursuant to the policies and practices of the Lexington Police Department and the Lexington-Fayette County Urban Government, as described above, which were ratified by policymakers with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

23

146.   The policies and practices described in this Count were maintained and implemented by the Lexington Police Department and the Lexington-Fayette County Urban Government with deliberate indifference to Plaintiff's constitutional rights.

147.   As a direct and proximate result of the Lexington Police Department and the Lexington-Fayette County Urban Government's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

148.   The Lexington Police Department and the Lexington-Fayette County Urban Government is therefore liable for the misconduct committed by its officers.

### Count VII – State Law Claim
### Malicious Prosecution

149.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

150.   Through their actions as described above, the Defendant Officers caused Plaintiff to be improperly subjected to a prosecution for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of his innocence.

151.   The Defendant Officers accused Plaintiff of criminal activities knowing those accusations to be without genuine probable cause; fabricated evidence and withheld the manner in which that evidence was fabricated; and made statements and reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

152.   The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment and/or official responsibilities.

153.   As a result of this misconduct, Plaintiff suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count VIII – State Law Claim
### Negligent Supervision

154.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

155.   The municipal defendants, as well as the supervisory defendants, had a duty to properly train and supervise officers, detectives, and supervisor employees of the Lexington Police Department, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

156.    The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant Officers, resulting in Plaintiff being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

157.   As a result of this misconduct, Plaintiff suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

## Count IX – State Law Claim
## Defamation

158.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

159.    Defendants waged campaigns against Plaintiff, in which they advanced and caused to be published intentionally false and misleading statements and lies about or concerning Plaintiff that they knew to be false, including repeatedly accusing Plaintiff of crimes he did not commit, and in so doing committed defamation *per se*.

160.    Based upon Defendants' misconduct, including the initiation of charges without probable cause, Defendant Gordon issued a press release containing defamatory statements concerning Plaintiff. These statements were published in news sources around the country, including ESPN, Louisville Courier-Journal, the New York Post, and ABC News.

161.    By engaging in the misconduct described in this Count, Defendants made demonstrably false statements about and concerning Plaintiff, and they caused those statements to be widely published in major public newspapers distributed throughout the entire world. The things these Defendants said and/or wrote about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and these Defendants made these statements knowing that they were entirely false.

162.    The statements made by Defendants described above are wholly untrue accusations of criminal offenses, which constitute defamation *per se* in Kentucky.

163.    These defamatory falsehoods were made with actual malice by Defendants inasmuch as they knew of their falsity or recklessly disregarded their truth or falsity.

164.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

165.    In particular, the Defendants' defamatory falsehoods have and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a criminal; (b) by limiting Plaintiff's employment options and his future career prospects; and (c) by subjecting Plaintiff to harassment and additional persecution for a crime he did not commit.

166.    The actions and omissions of Defendants set forth in this Count demonstrate malice, egregious defamation, and insult. These Defendants' actions and omissions were undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from the Defendants' conduct.

## Count X – State Law Claim
## Respondeat Superior

167.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

168.    In committing the acts alleged in the preceding paragraphs, some of the Defendant Officers were members and agents of the Lexington Police Department, acting at all relevant times within the scope of their employment.

169.    Defendant Lexington-Fayette County Urban Government is liable as principals for all state law torts committed by their agents.

## Count XI – State Law Claim

## Negligent Hiring Against Defendant Lexington-Fayette County Urban Government

170.    Each of the paragraphs of this Complaint are incorporated as if fully stated herein.

171.    Defendant City of Lexington and Lexington-Fayette County Urban Government was negligent in hiring Defendant Vinlove as an employee of the Lexington Police Department.

172.    By the time that Defendant Vinlove was employed at the Lexington Police Department, Defendant City of Lexington and Lexington-Fayette County Urban Government knew or reasonably should have known that Defendant Vinlove was unfit for the job for which he was employed.

173.    Defendant City of Lexington and Lexington-Fayette County Urban Government's hiring of Defendant Vinlove created an unreasonable risk of harm to the Plaintiff and others in the Lexington community.

174.   While Defendant City of Lexington and Lexington-Fayette County Urban Government was negligent for hiring Defendant Vinlove, it was also negligent for the retention of Defendant Vinlove.

175.   Defendant Vinlove's misconduct in this case was a predictable – and avoidable – consequence of his employment at the Lexington Police Department.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment in his favor and against Defendants and other unknown officers from the Lexington Police Department, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Amy Robinson Staples
*One of Plaintiff's Attorneys*

Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902